## Andrews *versus* Bell.

1. In a contract for the sale of land no time was fixed when the deed should be made and the consideration paid ; the contract was to be executed at once, or at least without unreasonable delay.

2. The contract is alone to be looked at in inquiring after the rights and duties of the parties, and the vendor might have tendered a deed the next day after the contract and sued for the consideration.

3. By a contract the vendee had the option to pay in cash or "certified estimates" of a railroad company; he could not delay payment until a change might take place in the market value of the estimates.

4. When an unexcused delay in payment at the time stipulated in a contract has produced a material change of circumstances, making the contract more onerous on one of the parties, a court of equity will not decree its performance at the suit of the defaulting party.

5. After the consideration was due, the vendor tendered a deed, which was refused by the vendee. He could pay afterwards only in money.

6. In construing an agreement for the sale of land which was part of a town-plot, and of which the lines were obscurely described, it was indispensable to consider that the sale was made with reference to the plan of the town.

7. An obscure description of land defined.

November 16th 1867.   Before THOMPSON, STRONG, READ and AGNEW, JJ.   WOODWARD, C. J., absent.

Appeal from the decree of the District Court of *Allegheny county :* In Equity.   No. 110, to October and November Term 1867.

On the 25th of February 1865, James Andrews filed a bill in equity against Thompson Bell to enforce specific execution of a contract for the sale of land to the complainant.   The bill avers that on the 10th of August 1864, the defendant entered into a written agreement with the complainant to sell to him " a piece of ground in the plan of Benvilla, containing about 5 acres, more or less, and described as follows: Beginning at a point on the eastern line of street not yet open, but representing a continuation of Fleming street, corner of lot No. 52, thence eastwardly along Thompson Bell's line, about 440 feet, to a point corresponding with western line of lot sold to Dr. C. G. Hussey ; thence northwardly and parallel with the line of Federal street, to the south-west corner of lot sold for a burying-ground ; thence a right angle westwardly 250 feet, to Willis street; thence northwardly to southern side of a 30-foot street; thence a right angle westwardly along line of said street, about 160 feet ; thence a right angle southwardly by eastern line of street not open, to place of beginning.   The street corresponding with Fleming street not to be opened.

Thompson Bell reserves in this a piece of ground on which the spring-house is built—about 30 by 80 feet.   He also reserves the right to purchase from said James Andrews, and Andrews agrees

to sell, the ground between the 30-foot street on northern side of spring-house and Willis street, at $1500 an acre. Thompson Bell further agrees to give to said James Andrews and Robert Henderson the right of way over a road marked in dotted lines around the Nunnery Building, &c. * * * In consideration of which, the said James Andrews agrees to pay the said Thompson Bell $1500 an acre, or $3000 per acre for right of way and ground, payable in certified estimates of Pittsburg and Steubenville Railroad Company, dated March 1859," &c.

The bill further states, that, after the date of the agreement, the complainant had had the land surveyed; that it contained 6 acres strict measure, and was bounded as follows:

"Beginning at a point on the southern line of said Bell's land where said line intersects the eastwardly line of a continuation of Fleming street not yet open; thence N. 77° E. 440 feet along the said southern line to line of lot sold by the said Bell to C. G. Hussey; thence N. $12\frac{3}{4}$° W. along the line of said lot 589 feet to the south-west corner of a lot sold for a graveyard; thence S. 77° W. 250 feet to Willis street; thence N. $12\frac{3}{4}$° W. 15 feet to the southern side of a 30-foot street; thence S. 77° W. along southern line of said street 190 feet; thence S. $12\frac{3}{4}$° E. by eastern line of street not open, 604 feet, to the place of beginning."

That the road mentioned in the agreement contained 1 acre and 30 perches, and that the spring-house reserved is not on the land described in the agreement, but on other land of Bell's. The bill further avers, that by direction of Bell, in January 1865, he paid to Mr. Shiras, Bell's attorney, $5000 in certified estimates, which he believed Bell received; and that, on the 30th of that month, he tendered to Bell such an amount of certified estimates as, with those already received, would make up what he had agreed to pay, and demanded deeds for the lot and right of way, which Bell refused; that he is still ready and willing to pay to Bell the certified estimates upon Bell delivering good and sufficient deeds, &c.: the bill prayed that Bell may be decreed to execute the deeds and receive the estimates in payment.

On the 12th of April, Bell, in his answer then filed admitting the contract, averred that the intent was that it was to be carried into effect immediately, or within a reasonable time; that he frequently urged compliance by Andrews; that for some months after the agreement, certified estimates were selling in the market for above fifty cents in the dollar, during which time he was willing to receive them, and Andrews promised to procure them; that deeds for roadway and lot, respectively, were tendered on the 7th and 10th of September 1864, and payment demanded and refused. He averred that about this time proceedings were threatened against the Pittsburg and Steubenville Railroad Company on a mortgage, with a view to the sale of the road, and that a rapid depreciation of their certified estimates ensued. He claimed that

[Andrews v. Bell.]

Andrews had forfeited his right to pay in estimates; that he (Bell) was willing, up to January 12th 1865, to receive the certified estimates, but since then had refused, and still refused, to receive them. He further averred his readiness to deliver the deeds upon payment of the consideration, crediting Andrews with $5000 of estimates already received, and that Andrews might at any time have taken possession of the land; he denied that Andrews ever made distinct demands for the deeds, and that when he expressed readiness to accept, it was on condition of Bell receiving certified estimates. The complainant filed a replication May 1st 1865.

On the 12th of June 1865, the complainant presented a petition stating that he supposed the survey as set out in his bill was in accordance with the agreement, but that late in May he had learned that it was incorrect, having been made by the surveyor under the directions of the defendant; that instead of extending Fleming street truly, and beginning the survey on its eastern line, the beginning and the west line had been put more than 100 feet east of their true position. The petition then avers that the following are the true boundaries and contents:

"*Beginning at a point on the eastern line of a street not yet opened, but representing a continuation of Fleming street, corner of lot No. 52, where the southern line of Bell's land intersects the said line, thence N. 77¼° E. along said southern line 543 feet,* to a point corresponding with the western line of lot sold by said Bell to C. G. Hussey; thence along the said line N. 12¾° W. 589 feet, to the south-west corner of a lot sold for a burying-ground; thence at right angles S. 77¼° W. 250 feet, to Willis street; thence N. 12¾° W. 15 feet to the southern side of a 30-foot street; *thence at right angles along the line of said street, S. 77¼° W. 293 feet, to the eastern line of a continuation of Fleming street;* thence at right angles S. 12¾° E. 604 feet, by the eastern line of a street not yet open, (*being a continuation of Fleming street*), to the place of beginning, containing 7 *acres and* 119.62 *perches*, strict measure."

The petition asked that the court would allow the bill to be amended by inserting this description in the petition; the amendment was allowed.

The defendant filed an answer denying the correctness of the description in the amended bill, and asserting the correctness of that in the original bill, and refused to make a conveyance according to the corrected description.

The case was referred to James Veech, Esq., as master. The master found that the contracts were made as set forth in the bill: that McHendry, a surveyor, at the instance of Andrews and in the presence of Bell, but not of Andrews, and without the article of agreement or a copy, made a survey of the land, which was found to contain 5 acres and 84 perches; the roadway was found to contain 1 acre and 30 perches. In November and December

[Andrews *v.* Bell.]

1864, Bell frequently urged Andrews to procure the estimates, saying, if he would give him $3000 or $5000 he would give him time for the remainder.

Andrews, as a contractor for work done by him, was entitled to receive from the Pittsburg and Steubenville Railroad Company a large amount of certified estimates, which were dated March 1st 1859, and bore interest. From April to June 1864 these estimates sold in the market from 55 to 70 cents on the dollar; no market price afterwards was shown. In January 1865 they were offered at 50 cents, but there were no buyers, and there was no proof of sales after January 1865 at any price. About the 1st of January 1865 it became known that the mortgage-bondholders of the railroad company were about to press a sale under the mortgages for non-payment of interest, which was largely in arrear.

On the 10th of January 1865, Bell, by Bigelow, his agent, tendered to Andrews a deed, which was dated and executed on the 10th of September 1864, in which the land is thus described, viz.: "Beginning at a point on the southern line of Thompson Bell's property, and distant 1100 feet from the eastern line of Federal street, and on a line with the western side of a lot sold C. G. Hussey; from thence N. 12$\frac{3}{4}$° W., and parallel with Federal street 589 feet to a fence on the southern boundary of cemetery lot; thence S. 77$\frac{1}{2}$° W. 250 feet; thence N. 12$\frac{3}{4}$° W. 15 feet; thence S. 77$\frac{1}{2}$° W. 190 feet; thence S. 12$\frac{3}{4}$° E. 604 feet, to southern line of said Bell's property; thence N. 77$\frac{1}{2}$° E. 440 feet, to place of beginning, containing 6 acres;" and demanded payment, "$9000 in money or $18,000 in Pittsburg and Steubenville Railroad Company scrip." The deed was not *stamped*, and for that reason, as assigned by Andrews, he refused to receive it. On the 12th January 1865, the same deed, with the proper stamps on it, was again tendered by the same agent, and payment demanded as before. Andrews, at first, objected to the deed, because the stamps were not cancelled; but upon Mr. Bigelow saying he had authority to cancel them if the deed was accepted, &c., Andrews said the deed was not according to the agreement; but did not state wherein. He declined to receive the deed and pay the money or the "scrip."

Between the 12th and 16th of January Andrews procured $5000 of estimates, and took them to Bell's place of business. Bell was absent, but had left with his clerk a receipt, which contained a denial of his being bound to receive any more; Andrews declined to pay on this receipt, but afterwards, under instructions from Bell, took the estimates to Mr. Shiras, Bell's attorney, who received them, but gave no receipt, declaring at the same time that Bell, by his taking the estimates, did not waive any right to refuse more scrip.

On or before the 28th of January 1865, Andrews sent the draft of a deed to Bell for his execution. In it the land was described

[Andrews *v.* Bell.]

substantially as in the deed tendered by Bell on the 10th, except that it describes the beginning as " a point 44 feet westwardly of the N. E. corner of land belonging to David Davis, thence N. $12\frac{3}{4}°$ W. 589 feet, &c., &c., calling for a 30 foot street at the end of the 15 foot line, &c., to the beginning, containing 6 acres, strict measure."

Bell executed this deed January 28th, had it stamped, and tendered it to Andrews a few days afterwards, together with a deed for the road way. Andrews, after looking at them, said the road deed was right; said nothing as to the other, but did not accept it. The agent who tendered the deed thought he had been authorized to take estimates if offered. Andrews came with estimates the same day, but Bell told the agent not to take them.

Andrews had made repeated efforts to get a meeting of the directors of the railroad company to have his estimates issued to him, but without success, until, a short time before January 30th 1865, a meeting was held, and their issue ordered. On that day he received a large amount: he had received none since August 12th 1864.

On the 30th of January Andrews tendered to Bell $17,318.05 in estimates. Bell replied to the tender, " for the present I decline taking the scrip." He has not yet taken the estimates.

[Andrews *v.* Bell.]

The foregoing diagram will sufficiently, for an understanding of the case, indicate the " plan of Benvilla," the streets, lines, &c., referred to in the case.

The master further reported that Fleming street extends northward from the eastern part of the common in Allegheny city; thence to Hemlock street it diverges eastward from a line parallel with Federal street; is pretty well built on both sides, from the common to Hemlock street; from Hemlock to Fairmount street it is parallel with Federal street; about 60 feet south of Fairmount street it has no visible lines, and passes over a steep, rugged stone hill; looking southward from Bell's line at A, it is not traceable by the eye until beyond Hemlock street. It has been declared open as far as Fairmount street, and is laid down on the official map of the city up to Bell's line, which is the city limit. The deeds tendered and the claim of Andrews correspond substantially in the description of the land on the north, east and south. The dispute was whether the west line is the east side of the " street not yet opened," as claimed by Bell, or the east side of Fleming street extended, as claimed by Andrews. The spring-house lot contains 8.81 perches, and is within the limits claimed by Andrews; the content of Andrews's claim, *excluding* the spring-house lot, is 6 acres 119.19 perches; the content, according the limits claimed by Bell to be the true ones, is 5 acres 84 perches, but the spring-house lot is not within these limits. The content of the roadway is 1 acre 30 perches, which would make the whole content of *Andrews'* claim 7 acres 119.19 perches.

The master found that the amount of estimates paid and tendered, if computed without interest accrued on them, would leave due by Andrews, according to his claim, $2229.26; if the accrued interest were computed, the amount would much exceed the purchase-money. Estimating the consideration as payable in money, and crediting the " estimates" received, the balance due by Andrews would be $9398.66. The amount paid and tendered exceeded the purchase-money, according to Bell's claim as to the boundaries.

Exceptions were filed to the master's report.

The court, on hearing, dismissed the bill at the cost of the complainant.

*D. Reed* and *W. W. Thomson*, for appellant, cited 3 Leading Cases in Eq. 78–81; Benedict *v.* Lynch, 1 Johns. Ch. R. 370; Spurrier *v.* Hancock, 4 Ves. 667; Harrington *v.* Wheeler, Id. 686; Guest *v.* Homfray, 5 Id. 818; Hertford *v.* Boore, Id. 720 n.; Fisher *v.* Worrall, 5 W. & S. 485; Dalzell *v.* Crawford, 1 Pars. R. 41; Greenlee *v.* Greenlee, 10 Harris 235; Pennock *v.* Freeman, 1 Watts 408; Goring *v.* Nash, 3 Atk. 187; Buckle *v.* Mitchell, 18 Ves. 111; Demarest *v.* McKee, 2 Grant 248; Parish *v.* Koons, 1 Pars. R. 92; Corson *v.* Mulvany, 13 Wright 97.

[Andrews v. Bell.]

*F. Shiras, Jr.*, for appellee, cited Benedict v. Lynch; Spurrier v. Hancock; Harrington v. Wheeler; Hertford v. Boore; Fisher v. Worrall; Guest v. Homfray; Greenlee v. Greenlee; Pennock v. Freeman; Dalzell v. Crawford; Parish v. Koons; Demarest v. McKee (*supra*); Kirby v. Haines, 2 Ohio N. S. 326.

The opinion of the court was delivered, January 7th 1868, by

STRONG, J.—The article of agreement, the specific performance of which it is the object of the bill to enforce, specifies no time when the deed for the land should be made and when the consideration should be paid. It is therefore to be understood as imposing an obligation to execute the contract at once, or, at least, without any unreasonable delay. The contract alone is to be considered, when we inquire after the rights and duties of the parties. And looking to the contract, it is clear that Bell, the vendor, might have tendered a deed the next day after the agreement was signed, and brought a suit for the consideration. Such being the legal effect of the agreement, and the duty of the vendee to pay being immediate, it is most important to inquire, when he comes into a court of equity, whether he has performed that duty. Having secured by the contract an option to pay the stipulated price for the land either with money or with certified estimates of The Pittsburg and Steubenville Railroad Company, he was not at liberty to delay payment until a change might take place in the market value of those estimates. If in any case it is incumbent upon a party who seeks to enforce the specific performance of a contract, to show that he has been guilty of no unnecessary delay, the rule is peculiarly applicable to this case for reasons found in the contract itself. The vendee was bound to pay in money or certificates. The market value of the latter was changeable. What it was when the contract was made, the parties may be presumed to have known. What it might be at a later time, they could not know, and as only the vendee had an option the advantage of delay was altogether on his side, if his right to choose was not affected by delay. In the article of agreement there is nothing that justified delay in making payment until new certificates could be obtained from the railroad company. If the vendee desired to pay with certificates and he could not obtain them it was his misfortune, not that of the vendor. He might, perhaps, have obtained them from sources other than the railroad company. To a considerable extent they had been upon the market before the contract was made. They were the subjects of purchase and sale. In June 1864, or about that time, very shortly before the parties entered into their agreement, some were sold at 55 cents on the dollar, and in January 1865 they were offered at 50 cents and there were no buyers. The evidence very satisfactorily shows that the certificates were sinking in market

[Andrews *v.* Bell.]

value after the time when the parties entered into their agreement. In January 1865 no sales appear to have been made, and none thereafter. The master reports that about the 1st of that month it became known that mortgage bondholders of the railroad company intended to institute proceedings to sell the road on account of the non-payment of a large amount of interest in arrears. It does not, indeed, appear that Andrews, the vendee, had knowledge of any such intended proceedings. But general knowledge must have greatly depreciated the price of certified estimates of debt of the company, if not entirely destroyed their market value. Indeed, the fact is most significant that after that time there does not appear to have been any sale whatever. In view of this it is plain that the parties did not then stand in the same position as that in which they stood on the 10th of August 1864, when the agreement was made. If the price of the land could be paid in January 1865 with certified estimates, the contract did not then give to the vendor the advantages which it assured when it was made. This is a vital consideration when we are asked to decree specific performance at the suit of the vendee. Unless the diminution of advantage to the vendor was caused by his act, or assented to by him, it would be grossly inequitable to compel him to part with his land and receive in payment therefor only certified estimates. Such was not his contract. The legal effect of his agreement was that he would convey the land for a price to be paid in certificates, provided those certificates were paid at once, or without unnecessary delay. Failure to pay at the time stipulated in a contract may not in all cases be an insuperable bar to a decree for specific performance, but when an unexcused delay has produced a material change of the circumstances, when in consequence of it the contract has become more onerous upon one of the parties than it would have been if performed at the appointed time, a court of equity will never decree its specific execution at the suit of the defaulting party. The length of delay, though itself important, is less so than its effect upon the interests of the parties.

Nothing in this case presents any justification for the failure of Andrews, the complainant, to pay the price agreed for the land, either in money or in certified estimates, until January 30th 1865, when he tendered payment in the latter. It has already been said that no excuse is found in the fact that he could not or did not obtain from the railroad company such estimates until near the close of that month. He had taken the risk of that. Nor is there anything to show that Bell, the vendor, ever consented to such delay. On the contrary, he appears to have been urgent to have the contract executed. It was he that moved, not the complainant. He executed a deed on the 10th of September 1864, and presuming that the vendee would prefer making payment in certified

estimates, he pressed for them. According to the testimony of Robert Henderson, the only witness who speaks of the subject, in the fall of 1864 he urged repeatedly that Andrews should get the scrip, promising if he could get some then, he would give time to pay the balance. None was then paid to him. True, the witness says of one conversation between the parties, in the fall of 1864, that the understanding was, that as soon as Mr. Andrews could get the board of directors together to issue the estimates, he would hand them over to Mr. Bell to get his deed. This evidently means no more than the understanding of the witness as to what Andrews then promised, for he added immediately that Bell said he would take part—$3000 or $5000—at that time, and the balance at another. But Andrews then paid nothing. It was not until weeks afterwards, not until the rumor of intended proceedings by the mortgagees against the company had got afloat, that he paid or offered a dollar. It would be giving very undue effect to the testimony of Henderson, were it regarded as proving an agreement of Bell to accept estimates at any time when the board of directors might be got together to issue them, or to waive his rights under the contract. Nor is there anything favorable to the complainant's claim to be deduced from the fact that in January 1865 the vendor accepted $5000 in estimates, for the acceptance was accompanied by the declaration that it was not to be regarded as a waiver of the defendant's right to refuse payment of the balance in any other thing than money. Bell had waited for Andrews to enjoy his option longer than he was under any obligation to wait, and if then he accepted a part of the debt in certified estimates, it was a favor to the debtor, not the debtor's right. This is undeniably so, if the deed executed September 10th 1864, and tendered on the 10th of January 1865, and again on the 12th, was such a deed as the vendor was bound by the articles of agreement to make. Whatever option Andrews had prior to the tender, he had none afterwards. He was bound to avail himself of his right, if any he then had, to pay in estimates, when he was legally called upon for payment. Not having paid then in any way, he could only pay with money afterwards. His tender of estimates on the 30th of January 1865 was therefore ineffective to give him any standing in a court of equity.

We may add that his conduct, when the deed was tendered, shows that he was without any such excuse as he now sets up, for his laches. On the 10th of January he objected to the deed because it was not stamped. When it was again tendered stamped, he objected that the stamp was not cancelled. When that difficulty was removed, and only then he objected that the deed was not. according to the agreement. He did not state wherein, and that his objection was not because it did not grant all the land called for by the agreement is evident from the fact that when he came

[Andrews *v.* Bell.]

to file his bill he claimed a conveyance of the land as it was described in the deed. It is idle to contend after this that, by virtue of any arrangement with the vendor, he had a right to delay payment until he could obtain certified estimates from the railroad company.

But independent of any effect of the complainant's laches prior to January 12th 1865, treating that for the present as of no importance, we have said that if the deed tendered on that day was such as the agreement contemplated, the complainant had no right remaining after the tender to insist that the vendor of the land should receive payment of the purchase-money in certified estimates. This brings us to perhaps the most important question in the case. It is this: What were the boundaries of the lot which Bell undertook by the article to sell; or did the deed tendered by Bell properly describe the subject of the complainant's purchase? The parties differ in their understanding of the location of the west line of the lot. The description in the article of agreement represents the land sold as a piece of ground in the plan of Benvilla, containing about five acres, more or less, "beginning at a point on the eastern line of street not yet open, but representing a continuation of Fleming street, corner of lot No. 52; thence eastwardly along Thompson Bell's line about 440 feet, to a point corresponding with the western line of lot sold to Dr. C. G. Hussey; thence northwardly and parallel with the line of Federal street to the south-west corner of lot sold for a burying ground; thence a right angle westwardly 250 feet to Willis street; thence northwardly to the southern line of a 30 foot street; thence a right angle westwardly along line of said street about 160 feet; thence a right angle southwardly by eastern line of street not open, to place of beginning." This is the whole description.

In determining what the parties meant by it, it is indispensable to keep in mind that the property described was part of a town plot, and that the sale was made with reference to a plan of the town. That plan as attached to the complainant's bill represents streets laid out, some opened, and one running north and south, nearly or quite parallel with Federal street. The plan also represents lots laid out and numbered abutting westwardly on the street marked "street not yet open," the southernmost of which is numbered 52. It also exhibits a portion of Fleming street outside of the town plot, but that street is not in fact extended into the plot, nor is it marked upon the plan as a street either open or not yet open within the limits of the town. It is, however, to be seen where it would lead, if extended without deflection from its terminus on Fairmount street into the plot of the town. As already observed, it is not so extended, and it is not marked upon the plan as an opened or unopened street. Returning now to the description; it is, in some respects, undoubtedly

[Andrews *v.* Bell.]

obscure. The obscurity arises from an apparent discrepancy in the terms employed to designate the point of beginning. That is declared to be " a corner of lot No. 52," and a point on the eastern line of street not yet open." But what street? The agreement says one, " representing a continuation of Fleming street." It does not, however, say, a continuation by a right line, and the plan contemplated no such continuation. Besides, the corner of the lot No. 52 would not be on the eastern line of that street, if it were thus extended. It would be 102 feet further east. But it is on the eastern side of the street laid down on the plan and marked street " not yet open," and distant about 440 feet from the Dr. Hussey lot which bounds the property sold on the east. There would be no difficulty in fixing the location of this point, were it not for the phrase " but representing a continuation of Fleming street," used as descriptive of the street not yet open. That phrase must however be construed, if possible, so that it shall not contradict any other part of the description. And it may be. In a certain sense, a loose sense it is true, the street on the plan marked " not yet open," on which lot No. 52 abuts, represents a continuation of Fleming street. It does not, indeed, extend from Fleming in a continuous right line, but it runs in the same direction continuously north, and its debouch upon Fairmount street is only about 100 feet distant from the actual terminus of Fleming, connected with it by an intermediate street. It is easy to see how, with the plan before them, the parties to the agreement may have regarded and spoken of the street " not yet open," as representing a continuation of Fleming street, not an actual continuation but representing one. It must have been so, or the only definite description, the corner of lot No. 52, must be disregarded, and treated as meaning nothing. And if the parties did regard and speak of the street not yet open as representing a continuation of Fleming street, the entire description is consistent. All its particulars are in harmony. Beginning on the eastern side of that street, at a corner of lot No. 52, the distance eastward to the Hussey lot is about 440 feet, which is the distance called for in the description, and the length of the northern boundary including the breadth of Willis street is about the same. Then the quantity of land embraced within the boundaries is about 5½ acres (the quantity called for in the agreement being about 5 acres more or less). The description of the last-mentioned line may also be noticed. It is a line running at right angles from the southern side of a 30 foot street on the north, southwardly " by eastern line of street not open," to the place of beginning. The street by the eastern side of which it is to run is not named. It is not said by the eastern line of Fleming street continued, and there is on the plan no street not open, by

6 P. F. Smith—23

which it can run, unless the place of beginning is at the corner of lot No. 52.

On the other hand, if the point of beginning is as the complainant claims, on the east side of Fleming street extended continuously by a right line, not only must the call for the beginning at a corner of lot No. 52 be rejected, but the distances from the west to the east boundary of the lot must be greatly extended, made nearly a quarter longer than they are described in the agreement. Instead of being 440 feet, they become over 543, and the quantity of land instead of being about 5 acres becomes 6 acres and 119 perches. It is argued that the distances mentioned in the agreement, from the Hussey lot to the west boundary, must be treated as mentioned in mistake, and that they must be corrected by the call for the "street not yet open, but representing a continuation of Fleming street," on the principle that distances yield to calls for adjoiners, if inconsistent with such calls. But the principle is inapplicable to the facts of the case. Fleming street is not called for as an adjoiner; no mark on the ground, and none on the plan, are called for on the west, at the place where the complainant would locate the western boundary. In the aspect of the case most favorable to him, there is no more than a call for an imaginary, a possible line, not even appearing on the plan. The call for a corner of lot No. 52 is much more like a call which would control distances, if there were a mistake in them. That does appear upon the plan, and so does the street laid out but not yet open.

Another consideration of some weight, though not controlling, may also be mentioned. It is, that the west line claimed by the plaintiff, divides nearly in the middle a row of lots laid out in the plan of the town. Keeping still in mind that the plan was referred to, and was doubtless before the parties when they made their agreement, there is, to say the least, very considerable probability that such a derangement of the town-plot was not intended. On the other hand, the line claimed by the defendant runs along the east side of a street marked on the plan "not yet open," precisely as described in the contract. It divides no lots. It leaves the town-plot undisturbed. In view of all this, we think the true construction of the agreement is, that the vendor sold only that land which is bounded on the west by the eastern side of the street marked on the plan "not yet open," on which lot No. 52 abuts, and therefore that the deed tendered by him correctly described the property sold.

There is a clause in the article that, at first sight, is fitted to raise a doubt whether the parties did not understand it as embracing land farther west. It is that in which the vendor reserves a piece of ground on which the spring-house was built, about thirty by eighty feet. From this it would seem the parties thought

[Andrews *v.* Bell.]

the spring-house either was or might be within the boundaries of the tract sold; else why reserve it? In truth, it is not within the boundaries unless the western boundary is on Fleming street extended by a right line. But the reservation is no part of the description of the property sold, and its introduction into the agreement is susceptible of an easy explanation. It is found in the fact more than once repeated, that the sale was by the plan of the town. On that plan the spring-house was noted and located not on Fleming street extended, but east of the street marked "not yet open." On the plan, therefore, it appeared to be within the boundaries as we hold them to be. It was an incorrect representation, but it accounts sufficiently for its reservation by the vendor though not actually covered by the grant.

The agreement also contained a contract for the sale of a right of way to the complainant and one Henderson, for a stipulated price, payable as was the consideration of the land. Henderson did not sign the contract, and Andrews alone was responsible for the price. His laches in regard to that was the same as in regard to the purchase of the land. If he cannot maintain his bill for the specific performance of the executory sale of the land, he cannot for that of the right of way. The prayer of the bill is that the defendant may be decreed to execute and deliver deeds for the land and right of way, and to receive certified estimates in payment for them. To any such relief what we have said shows that he is not entitled.

The decree of the District Court is affirmed.